BEFORE THE THIRD DIVISION, JULY 22, 1953

No. 57432.—M. A. Giblin v. United States, petition 6907–R (New Orleans).

EKWALL, Judge: This petition has been brought under authority of section 489 of the Tariff Act of 1930 to recover duties assessed because of undervaluation of merchandise imported at the port of New Orleans, La. The importer of record is given on the entry as "Railway Express Agency for account of Campbell C. Cauthern." The invoice describes the merchandise as portraits, marine views, landscapes, and seascapes, all in oil. Twenty-four of the 55 items were advanced in value by the appraiser.

The petitioner appeared on his own behalf, without attorney. The Government attorney objected to any testimony given by said petitioner, but we are not advised of the ground for such objection, nor was it pressed. Said petitioner is referred to in the collector's letter of transmittal as "Railway Express Agency, M. A. Giblin, Export and Import Agent, on behalf of Campbell C. Cauthen." From the record, it is apparent that Mr. Giblin is the agent of the consignee.

The testimony of Mr. Giblin was substantially as follows: The paintings arrived by air express from Italy, and the witness was advised by Mr. Cauthen to clear the shipment through customs and to bill him for any charge. The witness accordingly made entry of the shipment. Several days after entry, he was asked by the Government examiner at the port of entry whether he had any information as to the prices of the paintings. He thereupon advised the Government official that he had no such information but would get in touch with Mr. Cauthen. He then wrote Mr. Cauthen advising him that the customs officials at New Orleans desired information as to prices and requesting Mr. Cauthen to furnish any correspondence which he might have between himself and the shipper. He received word from his principal that said principal had no correspondence; that 1 of the paintings was purchased by himself and the other 54 were to be distributed to various consignees throughout the United States; and that he, Mr. Cauthen, was merely acting as agent. The customs examiner then requested information as to whom the pictures were to be sent. Mr. Cauthen furnished the witness with a list of various individuals to whom the paintings were to be sent, which list was given to the Government examiner by the witness. Subsequently, the witness was advised by the customs officials that the paintings were undervalued and were to be seized. He notified Mr. Cauthen and requested him to communicate with the shipper in order to get some information as to the value of the paintings.

On cross-examination, this witness stated that Mr. Cauthen received a letter from the shipper which he gave to Mr. Fortier, the supervising customs agent at New Orleans, but he was unable to state the time when this occurred.

The witness stated that so far as he knew there was no intention to defraud the revenue and that he did not withhold any information from the customs officials.

Mr. Campbell Cauthen, Jr., testified that while in Italy in the armed services in 1948 he had a chance to buy some paintings from the agent of Mr. Maresca, the shipper, who was taking orders for portraits. He further testified as follows:

* * * I wrote Mr. Maresca and asked him the various prices of portraits as I wanted to give my father one for a Christmas present. In December 1948 I ordered the first portrait and after it came, other people seemed to want one and I wrote him and asked him if he wouldn't send—this went on while I was at Millsaps College.

JUDGE EKWALL: Did he paint the portraits from photographs?

MR. CAUTHEN: Yes, I would send the order over with the money and he would send me the portrait. Then in August 1951, still being in the Naval Reserve, I was called to active duty and sent to Korea in the Medics and I did quite a bit of business in portrait, ordering portraits from photographs, I wasn't the importer always, it was supplemental to my income to help me through college. When I went in Service in 1950, my wife was working in the First National Bank in Jackson, Mississippi and Mr. Maresca started to send these big shipments to her, it was just before Christmas, 1950, while I was overseas, she received from him a large shipment of about 40 paintings which he wanted to have her distribute for him all over the United States. She did that. In July 1951, I was still overseas and back to the United States for discharge and when I arrived home in Jackson I found all this going on, big shipment coming in for distribution, invoices wrong, going to seize it and all that. I wrote Mr. Maresca and told him what Mr. Fortier told me, that the shipment was undervalued. Mr. Maresca wrote back and sent me a price list. Out of the whole 54 pictures that he sent, only one was for us, which my wife had secured for the State of Mississippi. When I first contacted him he wasn't in the habit of sending invoices or price lists, I would send a photograph and he would send a painting and I didn't think there was any duty on paintings and I told Mr. Fortier that I didn't know anything about values and had bought paintings before which were under the prices at which the Appraiser gave this shipment. Well, Mr. Maresca sent me at my request a list of the prices and I had no way of comparing those prices so I forwarded it all to Mr. Fortier. Later the shipment was seized and I had an attorney in Jackson draw up my Petition for Remission * * *.

It developed from cross-examination that the supervising customs agent, Mr. Fortier, made an investigation as to the values of these paintings in the course of which he interrogated the individual purchasers of the paintings to find out just what each had paid.

The situation as outlined in the record is rather unusual. The consignee, while a member of the Armed Forces, transmitted orders for portraits and apparently other paintings to the artist who executed the commissions and sent the paintings to this country. Said consignee was unfamiliar with importing as a business and assumed that the paintings would be free of duty. Apparently, because of that assumption, he considered that the value of the paintings was unimportant. It is axiomatic that the petitioner is presumed to know the law and that ignorance thereof is no excuse. Nevertheless, under the circumstances of this case, the court is convinced that petitioner has established by satisfactory evidence that he was without any intent to defraud the United States, to conceal or misrepresent the facts of the case, or to deceive the appraiser as to the value of the merchandise. *Wolf* v. *United States*, 13 Ct. Cust. Appls. 589, T. D. 41453; *R. W. Gresham* v. *United States*, 27 C. C. P. A. (Customs) 106, C. A. D. 70.

The petition is, therefore, granted.